PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Putative Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SACRAMENTO CDJR LLC, a California limited liability company, d/b/a WWW.SACSUPERSTORE.COM,<br><br>Defendant. | Case No. 2:25-cv-08089-DMG-E<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

# I. INTRODUCTION

1. This case involves an outrageous privacy "bait and switch" scheme: Defendant lures individuals seeking to purchase or service a vehicle to https://www.sacsuperstore.com (the "Website") by assuring them that "Sacramento CDJR and each of our subsidiaries and affiliated entities under common ownership and control … respects your privacy and the information that you have entrusted to us." *See* https://www.sacsuperstore.com/tools/complyauto/privacy-policy.htm (last visited Oct. 3, 2025).

2. In reality, Defendant secretly allows notorious data brokers to (1) intercept communications from visitors and (2) use those communications to compile and sell deeply personal details about visitors to the highest bidders. The predictable result is a grave intrusion upon visitor privacy.

3. The CEO of the world's largest data broker recently bragged about the suffocating extent to which data brokers secretly track internet users. Referring to a typical web user as "Lola," he boasts: "***We know who she is, what she watches, what she reads, and who she lives with. Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that Lola has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that Lola's income has not been keeping pace with inflation.***"[1]

4. Putting profits over privacy, Defendant has partnered with three data brokers—Nexxen, LiveRamp, and PubMatic—to secretly install "Tracking Pixels" on its Website. Defendant secretly allowed these three companies to intercept the communication for the tortious purpose set forth below without Plaintiff's knowledge or consent. In doing so, Defendant has violated California Penal Code § 638.51.

[1] Lucas Ropek, ***Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users***, March 15 2025 (Gizmodo.com).

## II. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

6. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District. Defendant's wrongdoing alleged in this First Amended Complaint with respect to the configuration of its Website with software code technology including Tracking Pixels and third parties cookies has injured Class members, some of whom are residents of this District, which is by far the most populous federal judicial district in the nation. *See* https://www.justice.gov/usao-cdca/our-district/district-population (last visited Oct. 3, 2025).

7. Defendant is subject to personal jurisdiction because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

## III. PARTIES

8. Plaintiff is a resident and citizen of California.

9. Defendant is a limited liability company organized under the laws of the State of California that markets vehicles and vehicle servicing to customers in California via its Website.

## IV. FACTUAL ALLEGATIONS

### A. Defendant Secretly Partners with Data Brokers Nexxen, LiveRamp, and PubMatic and Other Third Party Entities to Track Visitors and Sell Their Personal Information To the Highest Bidders.

10. Defendant operates the Website.

11. On April 15, 2025, Plaintiff, by and through a computer expert, conducted an investigation of the Website, which confirmed that third-party cookies are stored on the visitor's browser when visiting the Website ***even before the visitor had an opportunity to interact with the cookie banner or consent management platform***

***("CMP") displayed on the homepage of the Website***. That is, before a visitor could either choose between cookie banner's two options to either "Deny targeting cookies" or "Allow all cookies" via buttons reflecting such two options, the Website's third parties cookies were loading and operational and stored on a visitor's Internet browser and/or hard drive. Thus, visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's cookie banner and/or privacy policy.

12. A screenshot created on April 15, 2025 identifying the third party cookies stored on the Internet browser when visiting the Website is depicted below:




13. The foregoing screenshot image depicts the Website's homepage for a first-time visitor, which includes a cookie banner or CMP. The developer tools panel on the right-hand side shows third party cookies stored on the browser without the visitor's consent being exercised.

14. Notably, the foregoing screenshot image demonstrates that the cookie banner or CMP is visible to the Website user, and that the user has not accepted "all cookies" or made any selection of cookies. If the user had already made a selection of the user's cookie preferences, then such cookie banner would no longer be visible to the Website visitor.

15. A cropped image of the foregoing screenshot with highlighting identifies the services on the Website on April 15, 2025 that each store their own third party cookies on the visitor's browser:

**Third-party cookies**

This site might not work if third-party cookies and other cookies are limited in Chrome. Learn more about how third-p

All Allowed

| Name | Domain | Type | Platform |
|---|---|---|---|
| demdex | .demdex.net | Tag Manager | Adobe Tag Manager |
| uuid2 | .adnxs.com | Advertising | AppNexus |
| anj | .adnxs.com | Advertising | AppNexus |
| test_cookie | .doubleclick.net | Advertising | Google/Doubleclick Ads |
| rlas3 | .rlcdn.com | Analytics | LiveRamp IdentityLink |
| pxrc | .rlcdn.com | Analytics | LiveRamp IdentityLink |
| KTPCACOOKIE | .pubmatic.com | Advertising | Pubmatic |
| KADUSERCOOKIE | .pubmatic.com | Advertising | Pubmatic |
| KRTBCOOKIE_1165 | .pubmatic.com | Advertising | Pubmatic |
| PugT | .pubmatic.com | Advertising | Pubmatic |
| _td_global | .in.treasuredata.com | Analytics | Treasure Data |
| tvid | .tremorhub.com | Advertising | Tremor Video |
| tv_UIDC | .tremorhub.com | Advertising | Tremor Video |
| abc | .esm1.net | Other | Unknown |
| akaalb_pixall_prod | pixall.esm1.net | Other | Unknown |
| lr | .esm1.net | Other | Unknown |
| abcp | .esm1.net | Other | Unknown |
| fe_sess_id_5410 | ut.foureyes.io | Other | Unknown |
| s_ecid | .fcacert.com | Other | Unknown |
| forty_n_user | autoleadstar.com | Other | Unknown |
| sda3pc | tagging.shiftdigitalapps.io | Other | Unknown |
| sdts | tagging.shiftdigitalapps.io | Other | Unknown |
| m | .vinlens.com | Other | Unknown |

16. As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Oct. 3, 2025).

**1. Nexxen**

17. Nexxen Inc. ("Nexxen") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

18. The Nexxen platform enables businesses to identify and segment visitors for marketing campaigns by collecting and analyzing audience data. This data can be bought or sold between companies to use for targeted advertising, deanonymizing users, or further monetization by reselling user data.

19. Defendant has installed on its Website a spyware pixel created by Nexxen to identify Website visitors (the "Nexxen Tracking Pixel").

20. According to Nexxen's own Privacy Policy (*i.e.*, the version that was last updated as of May 29, 2025) on its own website at: https://nexxen.com/privacy-policy/, Nexxen (along with its partners and customers) uses a variety of technology to collect information including pixels and cookies.

21. Such Privacy Policy then describes the Nexxen Tracking Pixel as "a transparent graphic image (usually a 1 x 1 pixel) that is placed on a web page and allows for the collection of information regarding the use of the web page that contains the tracking pixel. [Nexxen] collects technical and usage information through the use of tracking pixels." *See*

https://web.archive.org/web/20250625050723/https://nexxen.com/privacy-policy/ (last visited Oct. 3, 2025). Historical versions of Nexxen's Privacy Policy have been archived by the screen captures of the Internet Archive's Wayback Machine.[2]

22. Such Privacy Policy then describes a "cookie" as follows: "A 'cookie' is a string of stored code used by a website to send some data to a user's device. Depending on the settings of the device or web browser this data may be stored on the user's device so that the device can later return that data to the same website. Cookies can be used with online services, such as websites, email deliveries or advertising technologies, to recognize an Internet or mobile-connected device that they have encountered before. We use cookies to, among other things, 'remember' you, track user trends, and collect information about how you use Customer's sites or interact with the advertising we (or others) deliver on their behalf. We likewise use cookies to provide relevant content to you and replace non-relevant ads with ads that better match your interests. We also use cookies when you visit our site."

23. The Nexxen Tracking Pixel gathers data about visitor interaction with a website by tracking signals generated by website visitor actions like page visits, purchases, and video views. Nexxen combines that data with its proprietary algorithm to track visitors. *See* https://nexxen.com/nexxen-discovery/ (describing same) (last visited Oct. 3, 2025). Participating websites then cater their advertisements based on a collective knowledge of the user's actions. *Id.*

24. In the screenshot image below, the user's IP address is contained in the X-Proxy-Origin response header. When a visitor accesses a website using Nexxen, a

[2] The "Wayback Machine" is a digital archive of the World Wide Web that allows users to view past versions of websites. https://web.archive.org/ (last visited Oct. 3, 2025). It automatically captures snapshots of webpages at various points in time, and stores them with timestamps. It is used to determine how a website looked in the past, analyze the evolution of a website, and retrieve information that may no longer be available on the current iteration of a website. Information retrieved via the Wayback Machine is generally treated as authoritative. "In this district, the contents of web pages available through the Wayback machine are generally proper subjects of judicial notice 'as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[.]'" *Valenzuela v. The Kroger Co.*, 2024 WL 1336959, at *3 n.7 (C.D. Cal. Mar. 28, 2024) (Gee, J.) (citations omitted).

request is sent to the Nexxen tracking URL (adnxs.com), which allows Nexxen to gather data about the user's device and location. The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from where the request originated.




25. The foregoing screenshot depicts a visitor's interaction with the Website. It is not a "stock image" obtained from a visitor's interaction with some other website as alluded to in Defendant's Motion to Dismiss Plaintiff's Complaint. (Doc. 9 at 3:20-22; Page ID #66.)

26. As depicted in the screenshot below relating to the Website, third-party tracking cookies are stored on the visitor's browser, which track visitor browsing habits and interests, and infer intent, allowing companies can create highly detailed user profiles. The tracking cookies allow for user devices to be identified for enhanced tracking and the delivery of targeted content.



27. The foregoing screenshot depicts a visitor's interaction with the Website. It is not a "stock image" obtained from a visitor's interaction with some other website.

28. When Defendant embedded the Nexxen Tracking Pixel, it allowed Nexxen to covertly monitor visitor behavior in real time without the visitor's knowledge or consent, including Plaintiff.

29. As shown by the foregoing images identifying the Nexxen tracking scripts operating on Defendant's Website, the Nexxen Tracking Pixel (1) begins to collect information the moment a user lands on the Website before any pop-up or cookie banner advises users of the invasion or seeks their consent; and (2) requests and transmits other identifying personal information to Nexxen that allows Nexxen to link a user's behavior on Defendant's Website to the visitor's social media accounts.

**2. LiveRamp**

30. LiveRamp, Inc. ("LiveRamp") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

31. LiveRamp is a data onboarding platform that collects and integrates a company's online and offline customer data, mapping it to individual customer profiles. This enriched audience data is then uploaded to advertising platforms. The screenshot below is from the LiveRamp privacy policy stating how user information is collected and used for visitor identification and interest-based advertising.

> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services. You have the right to express a choice regarding LiveRamp using this data for the above purposes.

32. Defendant has installed on its Website a spyware pixel called the "LiveRamp Tracking Pixel" to identify and spy on visitors to its Website. According to LiveRamp, the LiveRamp Tracking Pixel "[i]mprove[s] the quality and richness of your first-party data." *See* https://liveramp.com/solutions/consumer-data-strategy/ (last visited Oct. 3, 2025).

33. The LiveRamp Tracking Pixel gathers data about visitor interaction with a website by tracking signals generated by website visitor actions like page visits, purchases, and video views. LiveRamp combines that data with its proprietary algorithm to track visitors. *See* https://liveramp.com/partners/ (describing same) (last visited Oct. 3, 2025). Participating websites then cater their advertisements based on a collective knowledge of the user's actions. *Id.*

34. As depicted in the screenshot below relating to the Website, a request is sent to the URL "idsync.rlcdn.com" to synchronize user data between LiveRamp and third-party partner platforms. Tracking cookies stored in the browser are included in this request to enhance visitor identification and enable deeper data enrichment. The server responds by updating the tracking cookies to align with any existing record for the user.




35. The foregoing screenshot depicts a visitor's interaction with the Website. It is not a "stock image" obtained from a visitor's interaction with some other website.

36. As shown by the foregoing image identifying the LiveRamp tracking scripts operating on Defendant's website, the LiveRamp Spyware (1) begins to collect

information the moment a user lands on the Website before any pop-up or cookie banner advises users of the invasion or seeks their consent; and (2) requests and transmits other identifying personal information to LiveRamp that allows LiveRamp to link a user's behavior on Defendant's Website to the visitor's social media accounts.

37. When Defendant embedded the LiveRamp Tracking Pixel, it allowed LiveRamp to covertly monitor visitor behavior in real time without the visitor's knowledge or consent, including Plaintiff.

**3. PubMatic**

38. PubMatic is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Oct. 3, 2025).

39. PubMatic acknowledges in the data broker registry for the California Privacy Protection Agency that it collects California consumers' precise geolocation[3] as depicted in the screenshot image below:

| Business Name (Doing Business As) | Email | Website | Minors | Precise Geolocation | Reproductive Healthcare Data |
|---|---|---|---|---|---|
| PubMatic, Inc. | pubmaticprivacy@pubmatic.com | https://www.pubmatic.com/ | No | Yes | No |

40. PubMatic is an advertising platform for the buying and selling of user data for interest based advertising campaigns. Below is a screenshot from PubMatic's privacy policy showing categories and usage of data collected from users. This states that online identifiers, demographic information, browser and device information, behavioral information, and geolocation information are collected to run targeted advertising.

/ / /

/ / /

/ / /

[3] As defined by the California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civ. Code § 1798.100 *et seq.*, "'Precise geolocation' means any data that is derived from a device and that is used or intended to be used to locate a consumer within a geographic area that is equal to or less than the area of a circle with a radius of 1,850 feet, except as prescribed by regulations." (Cal. Civ. Code § 1798.140(w).) "A consumer's precise geolocation" constitutes "Sensitive personal information" under the CCPA. (Cal. Civ. Code § 1798.140(ae)(1)(C).)

PubMatic SOLUTIONS PRODUCTS RESOURCES ABOUT CAREERS LOGIN

| | Purpose of Use | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Serve & Deliver Ads (Ad Services) | Ad Reporting | Frequency Capping | Targeted Advertising | Location Based Advertising | ID Syncs | Fraud Detection & Prevention (Security) | Business Operations & Improving the Ad Services |
| **Categories of Personal Data** | | | | | | | | |
| Online Identifiers | x | | | x | | x | | x |
| Demographic Information | x | | | x | | | | x |
| Browser and Device Information | x | x | x | x | x | x | x | x |
| Behavioral Information | x | x | | x | | | x | x |
| Ad Interaction | x | x | | x | | | x | x |
| Partner Provided Information | x | | | x | | | | x |
| Geolocation Information & Geolocation | x | | | x | x | | | x |
| Audience Segments | x | | | x | | | | x |

41. Defendant has also installed on its Website a spyware pixel called the "PubMatic Tracking Pixel" to identify and spy on visitors to its Website. According to PubMatic: "As one of the world's leading scaled digital advertising platforms, PubMatic continues to innovate to offer more transparent advertising solutions to publishers, media buyers and data owners, allowing them to harness the power and potential of the open internet to drive better business outcomes." *See* https://PubMatic.com/about-us/ (last accessed July 2025).

42. The PubMatic Tracking Pixel gathers data about visitor interaction with a website by tracking signals generated by website visitor actions like page visits, purchases, and video views. PubMatic combines that data with its proprietary algorithm to track visitors. *See* https://PubMatic.com/products/connect-for-publishers/ (describing same) (last visited Oct. 3, 2025). Participating websites then cater their advertisements based on a collective knowledge of the user's actions. *Id.*

43. When Defendant embedded the PubMatic Tracking Pixel, it allowed PubMatic to covertly monitor visitor behavior in real time without the visitor's knowledge or consent, including Plaintiff.

44. As depicted below in the following screenshots, the Website sends numerous requests to PubMatic to track visitor activity on the Website, then synchronizes the user's digital identity and attributed data across a network of third-party advertising services. The service continues to track visitors by storing tracking cookies in the visitor's browser that can covertly monitor users across the internet.







45. The foregoing screenshots depict a visitor's interaction with the Website. They are not "stock images" obtained from a visitor's interaction with some other website.

46. As shown by the foregoing images identifying the PubMatic tracking scripts operating on Defendant's website, the PubMatic Tracking Pixel (1) begins to collect information the moment a user lands on the Website before any pop-up or cookie banner advises users of the invasion or seeks their consent; and (2) requests and transmits other identifying personal information to PubMatic that allows PubMatic to link a user's behavior on Defendant's Website to the visitor's social media accounts.

**4. <u>Adobe Audience Manager</u>**

47. The Adobe Audience Manager (demdex.net) feature provided by Adobe collects user data from websites to build behavioral profiles and uses this data group them into audiences for various purposes. These purposes include advertising and tailoring website content for the specific user as explained in the screenshot below from Adobe Audience Manager's own website:

> Audience Manager helps you bring your audience data assets together, making it easy to collect commercially relevant information about site visitors, create marketable segments, and serve targeted advertising and content to the right audience. Furthermore, Audience Manager offers easy tag deployment and management with robust data collection, control, and protection.

48. Visitor IP addresses are collected for every new session on the Website to determine the geolocation of the visitor which can be used to segment users for targeted advertising.

49. The Website uses third-party cookies for Demdex.net to assign tracking IDs to users and record their online activity via data sent in network requests. These are the tracking cookies stored on the browser for enhanced visitor identification and tracking with future requests as depicted in the screenshot below.




50. The foregoing screenshot depicts a visitor's interaction with the Website. It is not a "stock image" obtained from a visitor's interaction with some other website.

51. The "demdex" tracking cookie is used to identify a specific user to link their activities on this Website to a visitor profile already stored.

### 5. Tremor Video

52. Tremor Video (tremorhub.com) is an online video advertising software company that allows businesses to monetize their website traffic by building segmented audiences and displaying targeted advertisements.

53. As depicted in the screenshot below, a request is sent to Tremor's servers to synchronize user cookie data and then they store their own third party tracking cookies onto the user's browser.




54. The foregoing screenshot depicts a visitor's interaction with the Website. It is not a "stock image" obtained from a visitor's interaction with some other website.

### 6. Pixall

55. Requests are sent to the ad exchange Pixall tracking pixel (esm1.net) to synchronize visitor cookie data with third-party platforms including Google, PubMatic, and LiveRamp to engage in real time bidding to display advertisements to visitors. Tracking cookies are stored on the browser as depicted in the screenshot image below:



56. The foregoing cookies and pixels were placed on the visitor's browser as opposed to a visitor's visit to a different website by preserving a copy of the network log during such expert's investigation of the Website. Such network log clearly shows the requests to the pixel and third party cookie services were made on behalf of the Website and not already on the visitor's browser. For example, if a user consents to the Website's cookie banner's request to allow all cookies, then additional requests are sent to ComplyAuto. The network log copied by Plaintiff's expert, in contrast, does not contain these additional requests to ComplyAuto, but it does contain the requests to the pixels and third party cookies either by Defendant's Website itself or on the Website's behalf by esm1.net.

57. The foregoing Tracking Pixels (and third party cookies embedded onto visitor browsers after visiting the Website) are not merely analytics tools — they are powerful surveillance mechanisms designed to identify and follow users across devices, sessions, and even websites, using a technique known as cross-device attribution. Here's how it works: **First**, when Plaintiff visited the Website, the Tracking Pixels (and third party cookies) were secretly loaded and covertly captured numerous device-specific attributes (including IP address, browser type and version, operating system, screen resolution, fonts and plugins, time zone, language, and hardware IDs). These data points were used to create a unique fingerprint of Plaintiff's device. **Second**, once the Tracking Pixels (and third party cookies) collected this fingerprint and associated it with Plaintiff, they were able to link Plaintiff's activity across different devices (e.g., laptop → mobile phone), different browsers (e.g., Chrome → Safari), and different websites and sessions (e.g., visiting news site → shopping site) through both probabilistic and deterministic methods. **Third**, the Tracking Pixels (and third party cookies) were invisible to Plaintiff, as there was no visible indication that the Tracking Pixels (and third party cookies) were present, and Plaintiff was not informed of the Tracking Pixels (and third party cookies) or their purpose on the Website before such Tracking Pixels (and third party cookies) were active on the Website at least as of April 15, 2025 ***even before a user even***

***interacted with the Website's cookie banner or CMP***. **Fourth**, Defendant and the data brokers collected and linked this cross-device data, and then sold it to third parties (advertisers, insurers, political campaigns, etc.), used to build consumer dossiers, including interests, income, health, and habits, and fed into real-time bidding systems to target users with tailored ads.

58. In short, the use of Tracking Pixels (and third party cookies) on the Website is a surreptitious and invasive surveillance practice. Through cross-device attribution, Tracking Pixels (and third party cookies) enable data brokers and their clients to secretly follow Plaintiff across Plaintiff's digital life, without consent, visibility, or meaningful choice. In the context of privacy law, this practice is not only deceptive—it is profoundly intrusive and highly offensive to a reasonable person, especially when conducted under Defendant's false pretense to protect and respect Plaintiff's privacy, as described above.

## B. Defendant's Privacy Policy Acknowledges the Website's Sharing or Selling of Personal Information of California Residents to Third Parties.

59. On September 15, 2025, Defendant filed its Motion to Dismiss Plaintiff's Complaint ("Motion to Dismiss"). (Doc. 9.) In so doing, Defendant filed as Exhibit A to its Motion to Dismiss a "Printout of Website Privacy Policy," which is intended to reflect the contents of the Website's Privacy Policy last updated on April 18, 2025 (the "Privacy Policy"). (Doc. 9-1.) The Privacy Policy makes numerous statements and disclosures relevant to the instant action as addressed below.

60. The Privacy Policy states that Defendant and its subsidiaries and affiliates entities under common ownership and control "respects your privacy and the information that you have entrusted to us." (Doc. 9-1; Page ID #79.)

61. Under the heading, "Notice at Collection," the Privacy Policy states that Defendant and its subsidiaries/affiliates collect, *inter alia*:

"• **Geolocation Data (non-precise)** such as locational data based on visitor IP addresses.

- **Identifiers** such as real name, postal address, IP address, email address, SSN, driver's license number, passport number, cookies, pixel tags, and similar identifiers.
- **Inferences** to create a profile about you reflecting your product or vehicle preferences, purchasing tendencies and behaviors.
- **Internet Activity** such as interactions with our websites, applications, and advertisements."

(Doc. 9-1; Page ID #81) (emphasis in original).

62. The Privacy Policy then states: "We use the categories of personal information listed above for one or more of the following 'business purposes' listed in the CCPA:

- **Advertising & Marketing** to send advertisements and marketing material via physical and electronic mail relating to product specials and other promotional events or offers, perform marketing research and data analytics, and perform similar activities.
- **Contextual and Behavioral Targeting** to provide contextual customization of ads shown as part of an interaction with our website or application, such as through the use of "first-party" or "session" cookies.
- **Counting Ad Impressions & Website Interactions** to audit interactions with our websites, applications, or advertisements, count ad impressions to unique visitors, verify position and quality of ad impressions, and perform similar activities."

(Doc. 9-1; Page ID #81) (emphasis in original).

63. The Privacy Policy also states:

"We collect the following categories of 'sensitive personal information', as defined in the CCPA, relating to California residents:

…

> **Precise or Specific Geolocation Data** such as tracking and online user-enabled location identification that is accurate within a radius of 1,750 feet (1,850 feet in California)."

(Doc. 9-1; Page ID #82) (emphasis in original).

64. The Privacy Policy then sets forth a chart that identifies specific categories of personal information that are "**Sold or Shared for Cross-context Behavioral Advertising (aka 'targeted advertising')**". (Doc. 9-1; Page ID #82) (emphasis in original). Such chart discloses that Defendant and its subsidiaries/affiliates sell or share for cross-context behavioral advertising/targeted advertising: "Geolocation Data (non-precise)," "Identifiers," "Inferences," and "Internet Activity." (Doc. 9-1; Page ID #83.)

65. The Privacy Policy then sets forth its "**California Privacy Policy**" including a chart named "Categories of Personal Information We Collect," (Doc. 9-1; Page ID #83-#86) (emphasis in original), that identifies specific categories of personal information that are collected including:

> "**Geolocation Data (non-precise)** such as locational data based on visitor IP addresses.
>
> **Identifiers** such as real name, postal address, IP address, email address, SSN, driver's license number, passport number, cookies, pixel tags, and similar identifiers.
>
> **Inferences** to create a profile about you reflecting your product or vehicle preferences, purchasing tendencies and behaviors.
>
> **Internet Activity** such as interactions with our websites, applications, and advertisements."

(Doc. 9-1; Page ID #85) (emphasis in original).

66. Such chart identifies the sources from which the personal information is collected as including, *inter alia*, "**Directly from Consumers** through our website forms and via in-person applications, forms and contracts." (Doc. 9-1; Page ID #84) (emphasis in original).

67. Such chart identifies the business or commercial purposes for which the personal information was collected or sold, *inter alia*, as follows:

> **"Contextual and Behavioral Targeting** to provide contextual customization of ads shown as part of an interaction with our website or application, such as through the use of 'first-party' or 'session' cookies."

(Doc. 9-1; Page ID #84) (emphasis in original).

68. The Privacy Policy then sets forth a chart named, "Disclosure of Personal Information to Third Parties," which identifies the foregoing categories of "Geolocation Data (non-precise)," "Identifiers," "Inferences," and "Internet Activity" as being either sold or shared for cross-context behavioral advertising (targeted advertising) to third parties including "Advertising Networks & Marketing Agencies." (Doc. 9-1; Page ID #86-#87.)

69. The Privacy Policy also states:

> "We use cookies and other similar technologies (e.g. web beacons, tracking pixels, scripts, fingerprinting, and local storage) to deliver content specific to your interests, track your website activity, help our Sites remember you, enhance your online experience with us, and provide you with information you're most likely to need. Cookies are small pieces of text used to store information on web browsers. Cookies and any technology that serves a similar purpose as a cookie in the context of tracking users/devices, identifying users/devices, processing information that users or their devices send to or through the Site, or building consumer profiles are included in our use of the term "cookie" for the purpose of this Privacy Policy. We, our service providers, or third-parties (e.g., advertisers and social media) may use and/or receive information from "first-party cookies" or "third-party cookies" as described below.
>
> Cookies are first categorized by who places them or who is intended to receive information from them (first-party vs. third party), and secondly by their purpose.
>
> **1. <u>First-Party and Third-Party Cookies</u>**

- ***First-Party Cookies.***

First-Party Cookies refer to cookies that are created or placed by us. Many first-party cookies are essential cookies as described below.

- ***Third-Party Cookies.***

Third-party cookies refer to any cookie that is created or placed by a third-party. A third-party cookie often (but not always) shares or enables the sharing of information to an entity other than our own Sites.

We employ a holistic approach to determine if a cookie is classified as "first-party" or "third-party" including the domain that creates the cookie; the cookie's domain attribute; and the domain of the server to which network requests that transmit information related to the cookie are sent. Accordingly, under this definition, even cookies with a first-party domain attribute may be classified as a "third-party cookie" if the cookie is set by, used by, or shared with a third party."

(Doc. 9-1; Page ID #92-#93) (emphasis in original).

70. The Privacy Policy also states under the heading of "Cookie Purpose Categories":

"**Targeting Cookies.** Also known as targeted advertising cookies and cross-context behavioral advertising cookies, these cookies are used to deliver advertisements that are more relevant to users based on their interests and browsing behavior. These cookies collect information about a user's online activities (including by uniquely identifying the user and/or user's browser and device), such as the websites they visit, the pages they view, and the links they click. This data can then be used to create a profile of the user's interests, which allows advertisers to display targeted ads that are more likely to be of interest to the individual. They are also used to limit the number of times an ad is shown and to help measure the effectiveness of advertising campaigns. Targeting cookies can also be used for retargeting, where ads for previously viewed products or services follow the user across different websites. The purpose of targeting cookies is to

improve the effectiveness of online advertising by showing users ads that are more aligned with their preferences and interests."

(Doc. 9-1; Page ID #93) (emphasis in original).

**C. Plaintiff's Experience**

71. Plaintiff visited the Website in December 2024 to shop for a vehicle and was unaware of the secret spyware being used to surveil visitors and monetize their personal information. Plaintiff is both (1) genuinely interested in the goods, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. The Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

**D. The Nexxen, LiveRamp, and PubMatic Tracking Pixels and Third Party Cookies of Other Entities are Trap and Trace Devices.**

72. Under the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*. ("CIPA"), it is unlawful to use a "trap and trace" device without consent. The Tracking Pixels—when used to collect and transmit information about a website visitor's communications—fall squarely within the statutory definition of such a device.

73. CIPA § 638.50(c) defines a "trap and trace device" as: "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."

74. CIPA makes it unlawful to install or use such a device without a court order or proper consent, even on a private communication system.

75. The Tracking Pixels are a "process" that captures routing and addressing information. As shown above, it captures and transmits the IP address of the originating

device, device identifiers such as cookies, device IDs, or browser fingerprints, URL referrer paths, headers, and session identifiers, and other dialing, routing, addressing, and signaling information that identifies the source of the user's electronic communication.

76. This data is the very type of "signaling information" contemplated by CIPA's definition of a trap and trace device. Just like a telephone trap and trace system captures the originating number, the Tracking Pixels identify the originating digital sender—Plaintiff—through the routing and addressing metadata automatically included in the HTTP(S) request. The same principle applies here: the Tracking Pixels and third party cookies are a 21st century analog to a telephone trap and trace device—monitoring the metadata of electronic communications without consent.

77. Defendant did not obtain Plaintiff's express or implied consent to be subjected to fingerprinting and de-anonymization via the Tracking Pixels or third party cookies for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a Court order allowing it to install the Tracking Pixels or third party cookies.

78. CIPA imposes civil liability and statutory penalties for the installation of trap and trace software without a court order. Cal. P. Code § 637.2.

**E. <u>Defendant's Conduct is Highly Offensive To A Reasonable Person.</u>**

79. Defendant's "bait and switch" scheme—luring visitors to its Website by falsely promising that it will safeguard their privacy while secretly partnering with notorious data brokers (and other third party entities) to secretly track each visitor and sell their private information to the highest bidders—is highly offensive to a reasonable person for at least five reasons. **First**, it breaches trust and expectations—Defendant explicitly promised to protect Plaintiff's privacy, but secretly used the Tracking Pixels (and third party cookies) in direct contravention of its explicit assurances ***before a visitor to the Website has an opportunity to select privacy-related options*** from the Website's cookie banner or CMP. **Second**, it involves deception because Defendant promises one thing but does the opposite. That kind of dishonesty makes the conduct more offensive than ordinary tracking because it undermines autonomy and consent—cornerstones of

digital privacy. **Third**, it occurs in a private and sensitive setting. **Fourth**, it enables unwanted third-party surveillance by allowing cross-site profiling and targeted advertising without Plaintiff's consent—something most people find invasive when done in secret. **Fifth**, it violates established privacy norms that companies will be transparent about tracking, obtain meaningful consent, and honor their privacy policies.

80. Defendant's conduct creates a genuine likelihood of serious harm to Plaintiff. Plaintiff is informed and believes and thereon alleges that the personal information Defendant surreptitiously harvested via the Tracking Pixels or third party cookies includes name, contact information, location data, browsing behavior, device fingerprints, and interests. This type of information can be—and has been—used for identity theft, targeted harassment, and manipulative advertising. Data brokers purchasing this information can assemble comprehensive profiles to discriminate, exploit, or endanger users, particularly vulnerable populations such as women, minors, and individuals seeking health services. The danger is not abstract: the FTC has warned that data sold to third parties may be used to expose sensitive locations like domestic violence shelters or reproductive clinics, as well as to facilitate stalking or physical tracking. Such practices impose serious privacy and safety risks, not mere discomfort.

81. Cross-device attribution is a technique used by data brokers and advertisers to link a person's activity across different devices—such as their phone, laptop, tablet, or smart TV. This means that even if someone switches from browsing on their phone to using a laptop, the data broker can still identify them as the same person.

82. Tracking pixels, which are tiny pieces of code embedded in websites or emails, are key to this. They quietly collect information like IP address, browser type, screen resolution, and behaviors like clicks or time spent on a page. When this data is combined with third-party data or identifiers (such as email hashes or cookies), it becomes possible to follow the user across multiple devices without their knowledge.

83. Lack of consent, visibility, or choice is a type of tracking that happens behind the scenes. Users aren't shown any clear notice that cross-device tracking is

happening. Often, even if privacy policies mention "personalized ads" or "analytics," they fail to disclose the true extent of this tracking, nor do they offer real choices (like opt-outs that actually work). That's why this practice has been criticized by regulators and privacy advocates as deceptive.

84. Courts and regulators (like the Federal Trade Commission and state Attorneys General) have increasingly recognized that undisclosed or misleading tracking practices—especially those that span across a person's devices and online life—are not just deceptive, but highly invasive.

85. This conduct is especially offensive when coupled with false privacy promises that Defendant will protect and respect user privacy. Courts have found that misleading consumers into thinking their privacy is respected—while secretly undermining that very privacy—is especially egregious and offensive.

86. The degree and setting of Defendant's intrusion is particularly severe—what sets Defendant's conduct apart is not just the nature of the information collected, but the context in which the intrusion occurred. The tracking took place in a purportedly trusted setting—Defendant's own corporate website—which explicitly assured Plaintiff that Plaintiff's privacy would be respected. Instead, Defendant implemented hidden surveillance code that began tracking Plaintiff without disclosure or authorization.

87. Defendant's motives and objectives were both deceptive and exploitative: the purpose of the intrusion further supports its offensiveness. Defendant did not track users for benign analytics or internal operations. Rather, Defendant partnered with data brokers known for trafficking in intimate and geolocation data—and did so to profit off of Plaintiff's personal information. This is not an isolated lapse in oversight; it is a deliberate business strategy premised on deception, surveillance, and commodification of user trust. Secretly surveilling users to profit from the sale of their personal data—while falsely promising not to—is the very definition of manipulative and predatory conduct.

88. There are no legitimate or countervailing interests or social norms that

render the intrusion inoffensive. **First**, the data at issue—such as real-time location, unique identifiers, or finance-related browsing—is highly sensitive and context-dependent. **Second**, users cannot meaningfully consent to a practice they are never told about, especially when they are affirmatively misled. Moreover, there is no legitimate business or social interest in falsely promising privacy protections while secretly violating them. The only "interest" advanced by Defendant is financial profit derived from deception—an interest that cannot render the intrusion inoffensive under state and federal law.

89. The intrusion is "highly offensive." Taken together, the factors articulated by California courts—the severity of the intrusion, the deceptive setting, the potential for serious harm, the exploitative motive, and the lack of any countervailing justification—all weigh heavily in favor of a finding that the intrusion was highly offensive.

## V. <u>CLASS ALLEGATIONS</u>

90. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All California residents who visited Defendant's Website while physically in California and whose personal information was shared with a data broker or other third parties by Defendant without effective and informed prior consent.**

91. <u>NUMEROSITY</u>: Plaintiff does not know the number of Class members but believes the number to be at least one hundred. The exact identities of Class members may be ascertained by the records maintained by Defendant.

92. COMMONALITY: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared Class members' personal information with a data

broker or other third parties;

b. Whether Defendant obtain effective and informed consent to do so;

c. Whether Plaintiff and Class members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

93. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

94. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

95. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Federal Wiretap Act

### (18 U.S.C. § 2511)

96. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

97. The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception. 18 U.S.C. § 2511(1)(a) & (d).

98. The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of

Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

99. Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

100. The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

101. No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by misrepresenting the nature of the data collection.

102. Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker or other third party entities to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on Defendant's Website or via use of third party cookies embedded onto Plaintiff's browser or device. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendants' facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

103. Defendant intended to disclose its Website visitors' personally identifiable

communications to data brokers and other third parties so that it could deliver targeted advertisements to its customers despite promising to protect user privacy and despite the fact that the Tracking Pixels and other third party technology began to collect user data immediately upon webpage loading without user consent.

104. Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of Tracking Pixels and/or third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

105. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CAUSE OF ACTION

### Violations of the California Trap and Trace Law

### Cal. Penal Code § 638.51

106. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

107. CIPA includes the following statement of purpose:

> "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

108. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

109. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order.…"

110. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

111. The data brokers' Tracking Pixels and the third party cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

112. At all relevant times, Defendant caused the data brokers' Tracking Pixels and other third parties' cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

113. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP

addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

114. Plaintiff did not provide her prior consent to Defendant's use of Tracking Pixels or third-party cookies and the corresponding software.

115. Defendant did not obtain a court order to install or use the Tracking Pixels or the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

116. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

117. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**THIRD CAUSE OF ACTION**

**California Intrusion Upon Seclusion**

118. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

119. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

120. By permitting third-party cookies to be stored on consumers' devices, which enabled the data brokers (and other third parties) to track and collect Plaintiff's private communications and other personal information without obtaining prior consent from Plaintiff, Defendant intentionally intruded upon Plaintiff's solitude or seclusion. Defendant effectively placed the data brokers and other third parties in the middle of communications to which they were not invited, welcomed, or authorized. Plaintiff is informed and believes and thereon alleges that such private communications and/or other personal information includes Plaintiff's browsing history, visit history, website interactions, user input data, demographic information, interests and preferences,

shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

121. The data brokers' (and other third parties') tracking and collecting of Plaintiff's private communications on the Website using Tracking Pixels or third-party cookies that Defendant caused to be stored on Plaintiff's device—and to be transmitted to data brokers (and other third parties)—was not authorized by Plaintiff.

122. Plaintiff had an objectively reasonable expectation of privacy surrounding her private communications and personal information on the Website based on Defendant's promise that it would protect Plaintiff's privacy, as well as state criminal and civil laws designed to protect individual privacy.

123. Defendant's intentional intrusion into Plaintiff's private communications would be highly offensive to a reasonable person given that Defendant's promise that it would protect Plaintiff's privacy and its omission that Defendant caused data brokers' Tracking Pixels and third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even before Plaintiff had an opportunity to make her privacy preferences via the cookie banner displayed on the homepage of the Website. Indeed, Plaintiff reasonably expected that by providing such cookie banner to allow Plaintiff to make her privacy preferences that when she rejected targeting cookies, Defendant would not cause such third-party cookies to be stored on her device or permit the data brokers or other third parties to obtain her private communications on the Website before making such selections.

124. Defendant's conduct was intentional and intruded on Plaintiff's private communications on the Website.

125. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

126. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

127. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## VII. PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. For an order certifying that the action be maintained as a class action, that Plaintiff be designated as the class representative, and that undersigned counsel be designated as class counsel;
2. Declaratory relief;
3. Actual and statutory damages;
4. Punitive damages;
5. Reasonable attorneys' fees and costs;
6. An injunction to prevent the unlawful conduct alleged above; and
7. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated: October 6, 2025

PACIFIC TRIAL ATTORNEYS, APC

By: *<u>/s/ Scott J. Ferrell</u>*
Scott J. Ferrell
Attorneys for Plaintiff and the Putative Class