**KLEIN THOMAS LEE & FRESARD**
Gregory P. Gilmer (SBN: 212067)
Email: greg.gilmer@kleinthomaslaw.com
Kristyn Wong (SBN: 346644)
Email: kristyn.wong@kleinthomaslaw.com
1920 Main Street, Suite 230
Irvine, CA 92614
Office: (949) 676-4570

Thomas L. Azar, Jr. (to be admitted *pro hac vice*)
Email: tom.azar@kleinthomaslaw.com
Sarah Molina (to be admitted *pro hac vice*)
Email: sarah.molina@kleinthomaslaw.com
100 N. Broadway, Suite 1600
St. Louis, MO 63102
Office: (314) 888-2970

*Attorney for Defendant SACRAMENTO CDJR, LLC*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

SACRAMENTO CDJR LLC,

Defendant.

**CASE NO.: 2:25-cv-08089 DMG (Ex)**
*[Removed from Los Angeles County Superior Court, Case No. 25STCV20947]*

*Assigned to: Dolly M. Gee*
*Magistrate Judge: Charles F. Eick*

**SACRAMENTO CDJR LLC'S MOTION TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Action Filed: July 15, 2025

**DATE:** January 9, 2026
**TIME:** 9:30 a.m.
**JUDGE:** Hon. Dolly M. Gee
**COURTROOM:** 8C

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 9, 2026 at 9:30 a.m., or as soon thereafter as counsel may be heard, in Courtroom 8C of the First Street Courthouse, 350 W. 1st Street, 5th Floor, Los Angeles, California 90012, Defendant Sacramento CDJR, LLC, will and hereby does move this Court for an order to compel arbitration or, in the alternative, for an order dismissing Plaintiffs' First Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6).

This motion is made on the grounds that Plaintiff agreed to arbitrate her disputes and has failed to state any legally cognizable claim. It is based on this Notice of Motion, the following Memorandum of Points and Authorities, the Declaration of Melody Cooke filed herewith, and on such other and further matters as may be presented to the Court at or prior to the hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 27, 2025.

DATED: November 10, 2025 KLEIN THOMAS LEE & FRESARD

By: /s/ *Kristyn Wong*
Gregory P. Gilmer
Kristyn Wong
Thomas L. Azar, Jr.
Sarah Molina
Attorneys for Defendant
SACRAMENTO CDJR, LLC

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ............ ii

I. INTRODUCTION ............ 1

II. RELEVANT FACTS ............ 2

A. The Parties ............ 2

B. The Website And Rodriguez's Allegations About It ............ 2

C. The Website's Privacy Policy And Arbitration Agreement. ............ 5

III. MOTION TO COMPEL ARBITRATION ............ 6

A. Legal Standard For A Motion To Compel Arbitration ............ 6

B. Arbitration Should Be Compelled On Rodriguez's Claims ............ 7

IV. MOTION TO DISMISS ............ 8

A. Legal Standard On A Motion To Dismiss ............ 8

B. All Claims Fail Because They Are Not Plausible ............ 9

C. The State Law Claims Fail ............ 10

1. No Viable Claim For Intrusion Upon Seclusion (Count III). ............ 10

2. No Plausible "Trap and Trace" Violation Alleged (Count II). ............ 14

D. The Federal Wiretap Claim Also Fails (Count I) ............ 17

V. CONCLUSION ............ 19

CERTIFICATE OF COMPLIANCE ............ 20

CERTIFICATE OF ELECTRONIC FILING ............ 21

PROOF OF SERVICE ............ **Error! Bookmark not defined.**

# TABLE OF AUTHORITIES


**Page(s)**

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 8

*Aviles v. Liveramp, Inc.*, 2025 Cal. Super. LEXIS 776 (Cal.Super.Ct. 2025) ........ 12, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........ 8

*Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ........ 6, 7

*Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686 (C.D.Cal. 2023) ........ 10

*Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010) ........ 14

*Cousin v. Sharp Healthcare*, 681 F.Supp.3d 1117 (S.D. Cal. 2023) ........ 10

*Doe v. Eating Recovery Ctr. LLC*, 2025 WL 2971090 (N.D.Cal. 2025) ........ 13

*Harrott v. County of Kings*, 25 Cal. 4th 1138 (2001) ........ 13

*Hernandez v. Hillsides, Inc.*, 211 P.3d 1063 (Cal. 2009) ........ 10

*Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633 (Cal. 1994) ........ 10

*Hubbard v. Google LLC*, 2024 WL 3302066 (N.D.Cal. 2024) ........ 10

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) ........ 10, 15

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................14

*In re Google Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)....................14

*In re Google, Inc. Privacy Policy Litig.*,
58 F.Supp.3d 968 (N.D.Cal. 2014) ....................10

*In re Meta Pixel Tax Filing Cases*,
2025 WL 2243615 (N.D.Cal. 2025) ....................12

*Jones v. Peloton Interactive, Inc.*,
720 F.Supp.3d 940 (S.D.Cal. 2024)....................10

*Jones v. Tonal Systems, Inc.*,
751 F. Supp.3d 1025 (S.D.Cal. 2024)....................10

*Kishnani v. Royal Caribbean Cruises Ltd*.,
2025 WL 1745726 (N.D.Cal. 2025) ....................11

*Licea v. Hickory Farms*,
Case No. 23STCV26148, 2024 Cal. Super. LEXIS 66498 (Cal.Super.Ct. 2024) ....................13

*Low v. LinkedIn Corp.*,
900 F.Supp.2d 1010 (N.D.Cal. 2012) ....................10

*Marcos v. T-Mobile USA, Inc.*,
2024 WL 5673416 (C.D.Cal. 2024) ....................7

*Mikulsky v. Noom, Inc.*,
682 F. Supp. 3d 855 (S.D.Cal. 2023)....................10

*Mitchener v. CuriosityStream, Inc.*,
2025 WL 2272413 (N.D.Cal. 2025) ....................11

*Nat.-Immunogenics Corp. v. Newport Trial Grp.*,
2018 WL 6168035 (C.D.Cal. 2018), *order clarified*, 2018 WL 6136146 (C.D.Cal. 2018), and *on reconsideration in part*, 2019 WL 3110021 (C.D.Cal. 2019)....................10

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ....................7

*Patrick v. Running Warehouse, LLC*,
2022 WL 10584136 (C.D.Cal. 2022), *aff'd*, 93 F.4th 468 (9th Cir. 2024) ....1, 6, 7

*Pena v. GameStop, Inc.*,
670 F.Supp.3d 1112 (S.D.Cal. 2023)....14

*Price v. Headspace, Inc.*,
2025 WL 1237977 (Cal.Super.Ct. 2025)....11

*Riganian v. LiveRamp Holdings, Inc.*,
2025 WL 2021802 (N.D.Cal. 2025) ....12

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1085787 (C.D.Cal. 2025) ....10

*Rodriguez v. Autotrader.com, Inc.*,
2025 WL 1122387 (C.D.Cal. 2025) ....10

*Rodriguez v. First Am. Fin. Corp.,*
No. 24STCV05383 (Cal. Super. Apr. 30, 2025) ....1

*Rodriguez v. Fountain9, Inc.,*
No. 24STCV04504, (Cal.Super. Nov. 21, 2024)....1

*Rodriguez v. Plivo Inc.*,
No. 24STCV08972 (Cal.Super. Oct. 2, 2024)....1

*Shulman v. Group W Productions, Inc.*,
955 P.2d 469 (Cal. 1998)....10

**STATUTES**

Wiretap Act, 18 U.S.C. § 2511 ....12, 13

Cal. Penal § 638.50, 638.51 ....9, 10, 11

Federal Arbitration Act, 9 U.S.C. § 1 ....2

**OTHER AUTHORITIES**

2015 California Assembly Bill No. 929, California 2015-2016 Regular Session (Hearing, Assembly Committee on Privacy and Consumer Protection April 21, 2015) ....11

https://www.cacd.uscourts.gov/privacy-policy ........ 11
https://www.uscourts.gov/privacy-security-policy ........ 11

**RULES**

American Arbitration Association, Consumer Arbitration Rules ........ 4
Fed. R. Civ. P. Rule 12(b)(6) ........ 4

## I. INTRODUCTION

Plaintiff Rebeka Rodriguez is a self-identified "tester" who seeks out and visits websites to bring privacy claims like those she asserts in this case against Defendant Sacramento CDJR, LLC.[1] She premises her claims here on the notion the Privacy Policy on Sacramento CDJR's website "explicitly promised" her certain privacy protections, but failed to live up to such promises.[2] But, the Privacy Policy Rodriguez pleads she reviewed and bases her claims upon actually discloses what information may be collected and how it may be used, and includes various methods for website visitors to opt out of such collection and use.[3] The Privacy Policy also includes (noticed at the very beginning) an arbitration agreement which provides that "visiting" or "using" the website constitutes an agreement to arbitration, and directs that "[i]f you do not agree, please do not use our Services or visit our Site."[4] This Privacy Policy (and its arbitration agreement) is also explicitly disclosed in a pop-up banner that appears when visitors arrive at the website.[5]

Rodriguez obviously cannot plead she had ***actual notice*** of the website's Privacy Policy (alleging she reviewed and relied on it, and even basing claims on it) while simultaneously claiming ignorance of its arbitration agreement. *See, e.g.*, *Patrick v. Running Warehouse, LLC*, 2022 WL 10584136, *5 (C.D.Cal. 2022), *aff'd*, 93 F.4th 468 (9th Cir. 2024). Indeed, between Rodriguez's own allegations about reviewing the Privacy Policy, and the website's pop-up banner specifically notifying

---

[1] *See* First Amended Class Action Complaint ("FAC"), ¶ 71. For a sampling of other, similar cases brought by Rodriguez, *see, e.g.*, *Rodriguez v. Fountain9, Inc.*, No. 24STCV04504, (Cal.Super. Nov. 21, 2024); *Rodriguez v. Plivo Inc.*, No. 24STCV08972 (Cal.Super. Oct. 2, 2024); *Rodriguez v. First Am. Fin. Corp.*, No. 24STCV05383 (Cal. Super. Apr. 30, 2025).

[2] *See, e.g.*, FAC, ¶¶ 1, 79, 122.

[3] *See, generally,* Declaration of Melody Cooke, Exhibit A, Privacy Policy for www.sacsuperstore.com ("Privacy Policy"), also available online at: https://www.sacsuperstore.com/tools/complyauto/privacy-policy.htm.

[4] *See id.* at pp. 1, 16.

[5] *See infra* at § II.B.

visitors about that policy and its arbitration provision, there is simply no question that Rodrigues is bound to arbitrate her claims.

In any event, even if arbitration was not required (and it is), each of her claims is legally deficient for a host of reasons, detailed herein. Therefore, if arbitration is not compelled, this case should be dismissed.

## II. <u>RELEVANT FACTS</u>

### A. <u>The Parties.</u>

Plaintiff Rodriguez pleads she is both (1) "a consumer privacy advocate who works as a 'tester' to ensure companies abide by the privacy obligations imposed by California law" and (2) "genuinely interested in the goods, services, and information available on Defendant's website." FAC, ¶ 71.

Defendant Sacramento CDJR is a Chrysler, Dodge, Jeep and Ram vehicle dealership located north of downtown Sacramento. *Id.* at ¶ 9.

### B. <u>The Website And Rodriguez's Allegations About It.</u>

Sacramento CDJR operates a website (<u>www.sacsuperstore.com</u>) to showcase its vehicle inventory and allow customers to schedule service appointments. *Id.* at ¶¶ 1, 9. Visitors to this website are immediately confronted with the pop-up banner and click-buttons shown below, advising them of both the site's Privacy Policy and the arbitration agreement contained within it:


**Your Privacy & Cookies** Language: **English**

This site deploys cookies and similar tracking technologies, including **essential cookies** for necessary website features, accessibility, and cookie preferences (which may interact directly with, or be shared with, third-party service providers), **functional cookies** for error reporting and to remember settings and deliver optional functionality (including live-chat and other tools, enabling data collection and sharing with third parties), and **marketing cookies** for targeted advertising and analytics. You can reject **marketing cookies** by pressing 'Deny marketing cookies', but we still use essential and functional cookies. By pressing 'Allow All Cookies', you consent to the use of all cookies and the sharing of information they collect with third parties. By continuing to use this site, you agree to our **<u>Privacy Policy</u>**, which includes an **Arbitration Provision**, and details the categories of personal information we collect, the purposes for which the information is used, and how to exercise your California privacy rights. To stop the sale or sharing of your personal information offline or limit the use of your sensitive personal information, click the pill icon or Your California Privacy Choices link at any time.

**<u>Your California Privacy Choices</u>**

**Deny marketing cookies** **Allow all cookies**

*See* www.sacsuperstore.com. Specifically, the pop-up banner explains that: (1) the website uses cookies; (2) "[y]ou can reject **marketing cookies** by pressing 'Deny marking cookies', but we still use essential and functional cookies"; (3) "[b]y pressing 'Allow All Cookies', you consent to the use of all cookies and the sharing of information they collect with third parties"; (4) "[b]y continuing to use this site, you agree to our **Privacy Policy** [hyperlinked], which includes an **Arbitration Provision**, and details the categories of personal information we collect, the purposes for which the information is used, and how to exercise your California privacy rights." *Id.* (all emphases in original). The banner remains until either the "Deny marketing cookies" or "Allow all cookies" button is clicked. *Id.*

Rodriguez alleges she visited the Sacramento CDJR website at some point in December 2024. *Id.* at ¶ 71. This paragraph (¶ 71) is the only allegation that appears to describe her own experiences with the website. But, she pleads almost no facts about her visit. *Id.* She does ***not*** plead, for example, what she saw or did on the website, what device she used to access the website, which browser she used during her visit, what "spyware" she encountered on the website during her visit, why she thinks there was "spyware" on the website when she visited it, what parts/features of the website she interacted with, whether she was in California at the time of her visit, or any facts to support her beliefs about the existence of any "Tracking Pixels" or "third-party cookies" in December 2024. *See generally* FAC.

Rodriguez does, however, plead she knew about and reviewed the website's Privacy Policy. For example, she bases her claims on allegations that Sacramento CDJR "explicitly promised" to protect her privacy, and that her privacy expectations on the website were based on a "promise" contained in – and her review of – the website's Privacy Policy (Exhibit A). *Id.* at ¶¶ 1, 79, 122. Citing and linking to the Privacy Policy, she contends the website's information collection is a "bait and switch" that is offensive to a reasonable person because the policy states that "Sacramento CDJR … respects your privacy and the information that you have

entrusted to us." *Id.* at ¶¶ 1, 79. But, as Rodriguez later acknowledges, the Privacy Policy is actually a detailed disclosure of all the various types of information that may be collected and how they may be shared, along with different ways a visitor can "opt out" of such sharing. *See, e.g., id.* at ¶¶ 59-70; *see also*, *generally*, Privacy Policy. Rodriguez does ***not*** allege she attempted to avail herself of any of the "opt out" options listed in the Privacy Policy. *See*, *generally*, FAC.

While Rodriguez also offers assorted other allegations about the website, she bases those on what her unidentified "computer expert" agent claims to have found on the site during a visit five months later, in April 2025. *See id.* at ¶ 11.

First, she alleges that Sacramento CDJR installed ***on its own website*** pixels created by data brokers Nexxen, LiveRamp, and PubMatic to allow the website to identify returning visitors, and that these pixels are capable of tracking page visits, purchases on the site, and video views. *Id.* at ¶¶ 1, 19, 23, 32, 33, 41, 42. There is no allegation, however, that the website actually allows any direct purchases or has any videos. *See*, *generally*, FAC. Rodriguez alleges (1) Nexxen describes its pixels as "a transparent graphic image … that is placed on a web page and allows for the collection of information regarding the use of the web page that contains the tracking pixel"; (2) each data broker's pixels allow monitoring of visitor behavior ***on the Sacramento CDJR website*** (not elsewhere or while a visitor is on other webpages), and begin operating when a visitor lands on the site; and (3) the pixels transmit some "identifying personal information" to the brokers, allowing them to piece that information together with other public data, like social media accounts, to create profiles. *Id.* at ¶¶ 11, 21, 29, 36, 46.

Second, Rodriguez alleges the website installed third-party cookies on the expert's browser during his/her visit. *Id.* at ¶ 11. She contends that due to these cookies, some "visitor data" from the visit is "harvested and shared" with third-party services. *Id.* One of the cookies is "demdex" from Adobe that is alleged to "identify

a specific user" to a previously stored visitor profile. *Id.* at ¶¶ 47, 51. Another cookie is "Tremor Video," whose function is not described. *Id.* at ¶¶ 52-53.

Based on this, Rodriguez contends that when she visited the website, information ("including IP address, browser type and version, operating system, screen resolution, fonts and plugins, time zone, language, and hardware IDs") was captured, thereby creating a "unique fingerprint" that – combined with some undescribed "probabilistic and deterministic methods" – could allow a link to be made across different website visits or devices. *Id.* at ¶ 57. She also suggests the website could "harvest" other information such as her name or interests – but she does ***not*** allege she even provided her name or any personal information while visiting the website. *See id.* at ¶¶ 80, 82; *see also*, *generally*, FAC. Rodriguez alleges the collection and sale of such information could be used to build consumer dossiers and target her with tailored ads. *Id.* at ¶ 57.

**C. <u>The Website's Privacy Policy And Arbitration Agreement.</u>**

While Rodriguez bases her claims on "promise[s]" in the Privacy Policy and her reading of it, she ignores the arbitration agreement included in the policy. *See id.* at ¶ 79; *see also*, *generally*, FAC. The policy begins with a bold/large font statement: **"NOTICE: This Privacy Policy Contains an Agreement to Arbitrate Disputes and a Class Action Waiver,"** along with a click-button that takes a reader directly to the arbitration provision further down, as shown below:

> **NOTICE: This Privacy Policy Contains an Agreement to Arbitrate Disputes and a Class Action Waiver.**
>
> **View Arbitration Agreement**

Privacy Policy, p. 1 (emphasis in original). That agreement provides:

> By using our Services, and visiting our Site, you agree to this arbitration agreement and class action waiver. If you do not agree, please do not use our Services or visit our Site.
>
> If any part of this arbitration agreement and/or class action waiver is found to be invalid or cannot be enforced, the rest of the arbitration agreement and class action waiver will still apply. The arbitrator will decide if any part is invalid or cannot be enforced.

*Id.* at p. 16.

The agreement to arbitrate covers "any controversy, claim, action, proceeding, demand, or dispute arising out of or related to your visit to the Sites, use of the Services, or the breach, enforcement, interpretation, or validity of this Privacy Policy or any part of it." *Id.* It further provides that "[t]he arbitration will be held pursuant to the rules of the American Arbitration Association – Consumer Arbitration Rules," and that "[t]he arbitrator will decide if any part [of this arbitration agreement] is invalid or cannot be enforced." *Id.*

## III. MOTION TO COMPEL ARBITRATION

### A. Legal Standard For A Motion To Compel Arbitration.

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* requires courts to stay judicial proceedings and compel arbitration of claims that are covered by a written and enforceable arbitration agreement. *Id.* at § 3. "The FAA limits the court's role to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 476 (9th Cir. 2024) (quotation omitted).

However, these "gateway issues" of validity and enforceability may be reserved for the arbitrator, provided that such delegation is "clear and unmistakable." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). This can be accomplished through a statement in the agreement that such a delegation is being

made, or simply by incorporating the rules of an arbitral forum (like the AAA) which empower the arbitrator to address such gateway issues. *See, e.g.*, *id.* at 1131 ("we hold that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability"); *see also Marcos v. T-Mobile USA, Inc.*, 2024 WL 5673416, *5 (C.D.Cal. 2024) (similar).

**B. <u>Arbitration Should Be Compelled On Rodriguez's Claims.</u>**

Contracts that are formed on the internet where a website's terms and conditions are posted via hyperlink, but do not require any affirmative "click" agreement by the visitor, are generally called "browsewrap" agreements. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014). In the Ninth Circuit, "the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions." *Id.* at 1176. While a browsewrap agreement may not be enforceable if the user lacked at least inquiry notice of its existence, "courts have consistently enforced browsewrap agreements ***where the user had actual notice of the agreement***." *Id.* (emphasis added). This is especially true where the website visitor admits she was aware of the website's terms' existence and used it anyway. *Id.*

"A defendant can establish sufficient notice by proving either that plaintiffs had actual knowledge of the agreement or that the defendant provided enough information to put plaintiffs on inquiry notice." *Patrick*, 2022 WL 10584136 at *5 (compelling arbitration for plaintiffs who "acknowledge[d] seeing a hyperlink to the Terms"). Here, Rodriguez pleads she reviewed the Privacy Policy and its terms and, in fact, bases her claims on the notion that the policy's statements were a "bait and switch" that tricked her. *See, e.g.*, FAC, ¶¶ 1, 79, 122. Thus, even if Rodriguez could claim she somehow missed the website's pop-up banner specifically informing her of the Privacy Policy and its arbitration agreement, she could never claim she was unaware of that agreement. Rodriguez also expressly pleads she took the affirmative action – continuing to use the website, and even sending her "computer

expert" agent back to use the site again months later to run various tests – that the pop-up and Privacy Policy state will constitute acceptance of the policy's terms. *See id.* at ¶¶ 11, 56; *see also* Privacy Policy, p. 16. Because Rodriguez pleads she had "actual knowledge" of the agreement and that she continued to use the website, a valid arbitration agreement clearly exists.

There is also no question that the broad scope of the Privacy Policy's arbitration agreement ("any controversy, claim, action … or dispute arising out of or related to your visit to the Sites") encompasses the claims asserted here. *Id.* But, in any event, the Privacy Policy clearly delegates all gateway issues to the arbitrator for decision. It does so expressly, providing that "[t]he arbitrator will decide if any part [of this arbitration agreement] is invalid or cannot be enforced." *Id.* And, it also adopts the AAA's Consumer Arbitration Rules (*id.*), which provide "[t]he arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or the arbitrability of any claim," as well as "the power to determine the existence or validity of a contract of which an arbitration clause forms a part." *See* American Arbitration Association, Consumer Arbitration Rules, R-7(a), (b) (available online at https://www.adr.org/rules-forms-and-fees/consumer/).

Because an arbitration provision exists and covers this dispute, the Court should stay this case and compel Rodriguez to arbitration.

## IV. MOTION TO DISMISS

### A. Legal Standard On A Motion To Dismiss.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This requires a plaintiff "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim for relief is context

specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663-64. And although for the purposes of a motion to dismiss, the court "must take all of the factual allegations in the complaint as true, [it is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678.

**B. <u>All Claims Fail Because They Are Not Plausible.</u>**

Rodriguez, a self-identified "tester" who has filed numerous nearly identical lawsuits, claims she visited the website in December 2024. *See* FAC, ¶ 71; *see also supra,* at fn. 1. But, aside from alleging she reviewed the Privacy Policy and was unaware of some "secret spyware," she pleads no facts about her own visit. See FAC, ¶ 71; *see also supra*, at § II.B.

All the allegations about the existence of cookies or pixels on the website are, evidently, based on what her hired "computer expert" claims to have encountered five months later. *See, e.g.*, FAC, ¶ 11. But, there are no facts pleaded to even suggest Rodriguez and her "expert" visited the same portions of the website or engaged in the same activities on it. *See*, *generally*, FAC. Like most websites, the Sacramento CDJR website includes a variety of different pages on various subjects, as well as things like interactive chat features that allow a visitor (if they wish) to ask questions about the dealership's inventory or get help in setting up a service appointment.




The website also allows visitors to save specific vehicles they may be interested in, so that they can come back to that same vehicle on a later visit.




With no information at all provided about Rodriguez's own visit, or the later visit(s) by her "expert," rote allegations about what the "expert" encountered five months later are simply not enough to plausibly suggest what Rodriguez encountered during ***her*** visit. And, since all of Rodriguez's claims (as discussed below) are founded on some purported violation of her privacy, these omissions infect each of her claims and renders them implausible. On this basis alone, dismissal is required.

**C. <u>The State Law Claims Fail.</u>**

***1. No Viable Claim For Intrusion Upon Seclusion (Count III).***

To prevail on a claim for intrusion upon seclusion, a plaintiff must prove she had both "an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source" and that the alleged intrusion occurred "in a manner highly offensive to a reasonable person." *Shulman v. Group W Productions, Inc.*, 955 P.2d 469, 490 (Cal. 1998). Neither is plausibly alleged here.

***First***, and at the most basic level, such claims cannot succeed where, as here, the plaintiff actively sought out an invasion of privacy because an essential element of intrusion upon seclusion is an "expectation of seclusion or solitude in the place, conversation or data source." *Id.* To show an expectation of seclusion or privacy, the plaintiff "must have conducted himself or herself in a manner consistent with an actual expectation of privacy, *i.e.*, he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant." *See Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633, 648 (Cal. 1994).

Courts recognize a "tester" who visits websites expecting or hoping to find an invasion of privacy cannot claim she had a reasonable expectation of privacy in the visit. *See, e.g.*, *Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1122387, *2 (C.D.Cal. 2025) (this plaintiff); *Rodriguez v. Autotrader.com, Inc.*, 2025 WL 1085787, *1 (C.D.Cal. 2025) (same); *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, *4 (C.D.Cal. 2023) (observing tester "fully expected that her chat would be recorded so that she could file this action"); *cf. Nat.-Immunogenics Corp. v. Newport Trial Grp.*, 2018 WL 6168035, *9 (C.D.Cal. 2018), *order clarified*, 2018 WL 6136146 (C.D.Cal. 2018), and *on reconsideration in part*, 2019 WL 3110021 (C.D.Cal. 2019) (finding attorneys' "representations to the courts about the lead plaintiffs [who were testers] having an expectation of privacy and not knowing that their calls would be recorded were false.").[6] Here, Rodriguez pleads she visits websites because she "works as a 'tester' to ensure that companies abide by the privacy obligations imposed by California law." FAC, ¶ 71. Thus, she cannot plausibly claim she had the "actual expectation of privacy" required for an intrusion upon seclusion claim, and this count should be dismissed. *See Hill*, 865 P.2d at 648.

***Second***, even aside from the fact that Rodriguez admits she seeks intrusions into her privacy, she does not allege sufficient facts to plausibly suggest she had any actual expectation of privacy in her visit to the website. She does not plead that she visited the website with any expectation of privacy (nor could she, given her role as a "tester"). The only allegations that even hint she might have believed her "privacy would be protected" are in ¶¶ 59-70, 79, 85, 122 and based on the website's Privacy Policy and its "promises." But, the Privacy Policy she cites clearly explains that

---

[6] *Nat.-Immunogenics* did not directly involve the question of whether the plaintiff in that case had an expectation of privacy, but rather involved allegations that a group of attorneys had "fabricated class-action litigation to extort money from defendants" by using such "tester" plaintiffs. 2018 WL 6168035, at *1. Sacramento CDJR cites it here for the proposition that no expectation of privacy exists when a tester seeks out violations.

information ***would*** be collected and used unless she opts out, something she does not allege she did. *Id.* at ¶ 1 (incorporating Privacy Policy); ¶¶ 59-70 (describing the website's ***disclosed*** collection/use of information); *see also* Privacy Policy. Because Rodriguez does not allege she visited the site with an expectation of privacy, and just alludes to such an expectation by citing a policy stating the opposite, her claim fails.

***Third*****,** even if Rodriguez had plausibly pleaded an actual expectation of privacy (and she does not), she lacks any legally protected privacy interest in her communications with Sacramento CDJR. To survive a motion to dismiss on such a claim, a plaintiff must identify the "specific personal information she disclosed that implicates a protectable privacy interest." *Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855, 864 (S.D.Cal. 2023). "[T]here is no legally protected privacy interest and reasonable expectation of privacy in electronic messages, in general. Rather, a privacy interest can exist, if at all, only with respect to the ***content*** of those communications." *Jones v. Tonal Systems, Inc.*, 751 F. Supp.3d 1025, 1043 (S.D.Cal. 2024) (emphasis added). "A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity." *Hill*, 865 P.2d at 654. But, where the content of the communication is not "likely to be embarrassing," there is no protected privacy interest. *Jones*, 751 F.Supp.3d at 1043-44; *see also Jones v. Peloton Interactive, Inc.*, 720 F.Supp.3d 940, 950-51 (S.D.Cal. 2024) (finding plaintiff failed to state a claim because "[t]here are two general categories of legally recognized privacy rights … 'informational privacy' which protects the dissemination of sensitive and confidential information, and 'autonomy privacy' which protects the rights to bodily autonomy," and plaintiff had failed to plausibly plead a violation of either).

Here, although Rodriguez alleges website pixels are generally ***capable*** of transmitting "identifying personal information" about visitors (FAC ¶¶ 29, 36, 46), none of the information alleged to have been captured or shared about her (IP

address, browser type, operating system, time zone, activity on the dealership website, *etc.*) falls within any traditional notion of sensitive information. *See* FAC, ¶¶ 57, 80. Indeed, she does not even allege she provided any such information while browsing the site. *See*, *generally*, FAC. Thus, for this reason too, she has no claim.

***Finally*****,** to state a viable intrusion claim, a plaintiff must show a "highly offensive" or "egregious breach of social norms." *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1078 (Cal. 2009). But "[c]ontemporary internet browsing involves the collection of users' data, including by tracking users across the internet, ***and a reasonable user should expect as much."*** *Hubbard v. Google LLC*, 2024 WL 3302066, *7 (N.D.Cal. 2024) (emphasis in original). Courts agree the collection of data by a website owner about visits ***to its own website***, or the disclosure of such data, is neither "highly offensive" nor "egregious." *See, e.g.*, *In re Google, Inc. Privacy Policy Litig.*, 58 F.Supp.3d 968, 973-75, 988 (N.D.Cal. 2014) (collecting and sharing such information does not meet the "'high bar' for the requisite intrusion that is highly offensive to a reasonable person"); *Low v. LinkedIn Corp.*, 900 F.Supp.2d 1010, 1016-17, 1025 (N.D.Cal. 2012) (disclosure of user's unique numeric code, URLs of pages viewed and website activity to third parties was not "highly offensive" or a "serious invasion" of a privacy interest).

Rather, this requirement is only satisfied if something truly out of the ordinary is alleged, such as with internet trackers that continued to monitor the user as they visit ***other*** websites or disclosed sensitive health information – something Plaintiff does not allege Sacramento CDJR's website does here. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598, 602 (9th Cir. 2020) ("finding allegations stated a claim for intrusion where "Facebook continued to collect their data ***after they had logged off*** the social media platform" (emphasis added)); *Cousin v. Sharp Healthcare*, 681 F.Supp.3d 1117, 1127 (S.D.Cal. 2023) (dismissing claims based on sharing plaintiff's browsing activity on site, but allowing claims about

disclosure of health information appointment page). For this reason too, Count III should be dismissed.

***2. No Plausible "Trap and Trace" Violation Alleged (Count II).***

California Penal Code §§ 638.51(a) and (b)(5) prohibit the installation of a "trap and trace device" without first obtaining a court order or the user's consent. Under this statute, a "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c). The statute contains several exceptions, including "to operate, maintain, and test" an electronic communication service, to "record the fact that a wire or electronic communication was initiated or completed to protect the provider," and "if the consent of the user of that service has been obtained." Cal. Penal Code § 638.51(b). Rodriguez's claim under this statute fails for several independent reasons.

***First***, Plaintiff's "trap and trace" claim fails because the statutory definition of "trap and trace device" does ***not*** include devices or processes that record or decode "the contents of a communication." *See* Cal. Penal Code § 638.50. "For purposes of § 638.51, 'trap and trace devices' by definition are tools which provide information about the 'who,' 'when,' and 'where' of communications—but not the 'what.'" *Mitchener v. CuriosityStream, Inc.*, 2025 WL 2272413, *5 (N.D.Cal. 2025) (quoting *Price v. Headspace, Inc.*, 2025 WL 1237977, *3 (Cal.Super.Ct. 2025)). Yet, Plaintiff explicitly pleads the pixels/cookies on the website ***can*** collect the ***contents*** of the communication and all manner of information, such as ***page visits***, ***purchases***, and ***video views*** as well as "***behaviors like clicks***," ***her name, location, browsing behavior and interests***. *See* FAC, ¶¶ 23, 33, 42, 80, 82. Courts reject the notion that devices able to collect such "what" information fall within the scope of the "trap and trace" law, or can plausibly be alleged to violate it. *See, e.g.*, *Mitchener*,

2025 WL 2272413, at *5; *Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726, *4 (N.D.Cal. 2025). Because Plaintiff alleges the website tools ***can*** capture the "what" (*i.e.*, the contents of her communications with the website), they cannot constitute a trap and trace device as a matter of law and Count II fails.

***Second,*** even if the pixels/cookies could not capture the contents of the communication (and Plaintiff alleges they can), the legislative history of § 638.51 makes clear that installing a tracking device or process ***on your own*** line or service is not encompassed within the trap and trace law. Indeed, the hearings on adoption of the law (whose purpose was "to authorize state and local law enforcement to seek emergency orders for pen registers/trap and trace devices used in telephone surveillance") explained that pen "registers/trap and trace devices are used by law enforcement for telephone surveillance to record incoming and outgoing phone numbers from a tapped line." 2015 California Assembly Bill No. 929, California 2015-2016 Regular Session (Hearing, Assembly Committee on Privacy and Consumer Protection April 21, 2015). As a matter of common sense, a person cannot "tap" their own line or device.[7] But here, Rodriguez alleges that Sacramento CDJR placed tools on its own website and ***not on her device or browser***. FAC ¶ 4. Because no "tap" of ***Plaintiff's*** device occurred, Rodriguez's claim must fail.

***Third,*** even if Rodriguez had alleged the pixels/cookies constitute a device or process to capture only her IP address and were not capable of capturing the contents of her communications (the opposite of the allegations here), that theory would transform essentially every website visit into a violation of the trap and trace statute and lead to absurd results. As one court recently observed, "it is normal for websites

[7]Indeed, cases allowing § 638.51 trap and trace claims to proceed typically involve lawsuits against ***the third-party*** tracking the information and ***not*** the operator of the website where the pixels were installed. *See, e.g.*, *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, **3, 11-12 (N.D.Cal. 2025) (allowing § 638.51 claim against a data broker that installed cookies and pixels on CVS website); *In re Meta Pixel Tax Filing Cases*, 2025 WL 2243615, **1, 3 (N.D.Cal. 2025) (allowing § 638.51 claim against Meta for installing pixels on tax preparer websites).

to track the IP addresses of their visitors." *Aviles v. Liveramp, Inc.*, 2025 Cal. Super. LEXIS 776, *6 (Cal.Super.Ct. 2025). In fact, if Rodriguez's theory were viable, this Court's own website would violate § 638.51 because, according to the Privacy Policy on the District Court's website, it collects "the IP address from which you accessed the Judiciary's website."[8]

In any event, California courts have rejected the notion that pixels, cookies, or other internet tools using IP addresses are really pen registers or trap and trace devices in disguise, noting that such an interpretation would be not only illogical, but also contrary to California's policy of promoting internet commerce:

> The court also finds public policy strongly disputes Plaintiff's potential interpretation of privacy laws as one rendering every single entity voluntarily visited by a potential plaintiff, thereby providing an IP address for purposes of connecting the website, as a violator. Such a broad based interpretation would potentially disrupt a large swath of internet commerce without further refinement as the precise basis for liability, which the court declines to consider.

*Licea v. Hickory Farms*, Case No. 23STCV26148, p. 6, 2024 Cal. Super. LEXIS 66498, *10 (Cal.Super.Ct. 2024). "Without alleging that Defendant installed software on ***Plaintiff's*** device or browser that collected incoming contact information to ***Plaintiff's*** device, Plaintiff has not alleged anything above and beyond how the internet normally works." *Aviles*, 2025 Cal. Super. LEXIS 776, at *6 (emphasis original). Since such allegations are lacking, dismissal is required.

***Finally,*** when interpreting ambiguous criminal statutes in California, courts apply the rule of lenity – even when the statute is being invoked (as here) in a civil action. *Harrott v. County of Kings*, 25 Cal. 4th 1138, 1154 (2001); *Doe v. Eating*

---

[8] *See* https://www.cacd.uscourts.gov/privacy-policy. The website of the entire federal judiciary also collects IP addresses. *See* https://www.uscourts.gov/privacy-security-policy.

*Recovery Ctr. LLC*, 2025 WL 2971090, *1 (N.D.Cal. 2025). That numerous California courts have found the alleged behavior does not constitute a trap and trace violation for the reasons above amply demonstrates that the statute certainly can (and should) be interpreted that way. So, even if the Court decides there is ambiguity as to the breadth of the statute, the rule of lenity should apply and the Court should construct the statute narrowly and in favor of the defendant. *E.g., Aviles*, 2025 Cal. Super. LEXIS 776, *6; *Licea,* 2024 Cal. Super. LEXIS 66498, *10.

For all of these reasons, the claim for violation of the trap and trace statute in Count II fails.

**D. <u>The Federal Wiretap Claim Also Fails (Count I).</u>**

The Wiretap Act prohibits the unauthorized "interception" of an "electronic communication." 18 U.S.C. § 2511. But the statute makes an exception where the person intercepting the communication "is ***a party to the communication*** or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d) (emphasis added).

When the defendant was the "known and intended recipient of the communications" on its own website, the "statute's 'party exception' bars Defendant's liability." *Pena v. GameStop, Inc.*, 670 F.Supp.3d 1112, 1118 (S.D.Cal. 2023) (dismissing wiretap claim where plaintiff visited the defendant's website and used it to communicate with the defendant on the website); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) ("Both [the ECPA and CIPA] contain an exemption from liability for a person who is a 'party' to the communication, whether acting under the color of law or not."). Here, Rodriguez pleads she visited Sacramento CDJR's website and engaged in "communications" between herself and Sacramento CDJR through that site. *See, e.g.*, FAC ¶¶ 98, 102, 104. Therefore, "because Defendant was the party that was meant to, and did,

receive Plaintiff's communications, under the party exception, any alleged interception of the communications is not actionable." *Pena*, 670 F.Supp.3d at 1118.

Rodriguez appears aware of this limitation, and tries to invoke an exception applicable where the purpose of an interception was to commit a tortious act. *See* FAC ¶ 102. But, this cannot save her claim. For starters, the tortious conduct cannot be the alleged wiretapping itself – and no separate tort is plausibly alleged here. *See supra*, § IV.C; *see also Pena*, 670 F.Supp.3d at 1119 (explaining the exception requires "independently illegal or actionable conduct" beyond the alleged violation itself, and that allegations of simply sharing information received with third parties for marketing or other purposes was insufficient to invoke it); *see also In re Google Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145 (3d Cir. 2015) ("[A]ll authority of which we are aware indicates that the criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruit."); *Caro v. Weintraub*, 618 F.3d 94, 98 (2d Cir. 2010) ("the defendant must have the intent to use the illicit recording to commit a tort or crime beyond the act of recording itself").

Rodriguez's suggestion that the Ninth Circuit held otherwise in *Facebook* is flat wrong. *See* FAC, ¶ 102. In actuality, Ninth Circuit simply found the party exception inapplicable in a case brought against Facebook because, there, Facebook was alleged to have accessed information visitors provided on ***other, non-parties'*** websites – ***not on its own website***. *See Facebook*, 956 F.3d at 596, 607-08. But, here, Rodriguez is suing Sacramento CDJR based on alleged violations on its ***own*** website, so the party exception clearly applies. *See*, *generally*, FAC. Furthermore, and in any event, Rodriquez pleads no facts – just bald conclusions – in trying to invoke the exception, which are clearly insufficient. *See* FAC, ¶ 102.

## V. CONCLUSION

For the reasons above, the Court should stay this case and compel arbitration or, in the alternative, dismiss the First Amended Class Action Complaint in its entirety and with prejudice.

Dated: November 10, 2025

**KLEIN THOMAS LEE & FRESARD**

By: /s/ *Kristyn Wong*
Gregory P. Gilmer
Kristyn Wong
Thomas L. Azar, Jr.
Sarah Molina

*Attorneys for Defendant SACRAMENTO CDJR, LLC*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for SACRAMENTO CDJR, LLC, certifies that this brief contains 5,781 words, which complies with the word limit of L.R. 11-6.1.

Dates: November 10, 2025 *<u>/s/ Kristyn Wong</u>*

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on **November 10, 2025**, a true and correct copy of the foregoing **SACRAMENTO CDJR LLC'S MOTION TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** was filed with the Clerk using the CM/ECF system, which will provide notice to the following counsel of record:

| | |
|---|---|
| Scott J. Ferrell, Esq.<br>Victoria C. Knowles, Esq.<br>PACIFIC TRIAL ATTORNEYS<br>A Professional Corporation<br>4100 Newport Place Drive, Ste. 800<br>Newport Beach, CA 92660 | Attorneys for Plaintiff<br>REBEKA RODRIGUEZ<br><br>Tel: (949) 706-6464<br>Fax: (949) 706-6469<br>Email: sferrell@pacifictrialattorneys.com<br>vknowles@pacifictrialattorneys.com |

Samie Long